IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Michael Gaston,

      Plaintiff,

v.

Norfolk Southern Railway Co., *et al.*,

      Defendants.

Case No: 2:17-cv-1151

Judge Graham

Magistrate Judge Deavers

<u>Opinion and Order</u>

    Plaintiff Michael Gaston, a train conductor for defendant Norfolk Southern Railway Company, stood on the exterior steps of a slow-moving locomotive when it was struck by a motor vehicle traveling about 30 miles per hour. The car, driven by defendant Alexandra Wallman, did not directly hit Gaston but missed him by no more than a few feet. Gaston alleges that he suffered injuries to his back and leg as a result of the impact of the accident.

    Plaintiff brings this action against Norfolk Southern under the Federal Employers Liability Act, 45 U.S.C. § 51, *et seq*. He alleges that his employer acted negligently by instructing him to stand on the exterior steps of a locomotive moving through a railway-roadway grade crossing. He further alleges that the train's engineer failed to sound the horn for the required period of 15 seconds before the locomotive entered the crossing. Finally, plaintiff alleges that the railroad was negligent in failing to instruct Gaston to activate the flashing red crossing lights at least 20 seconds before the locomotive entered the crossing.

    This matter is before the court on Norfolk Southern's motion for summary judgment. For the reasons set forth below, the motion is denied in part and granted in part.

**I.    Background**

    **A.    Factual Summary**

    Michael Gaston is a resident of Weirton, West Virginia. Gaston Dep. at 6. He is 47 years old and began working for Norfolk Southern in 2007. *Id.* at 5, 12. He worked primarily out of a Norfolk Southern facility in Mingo Junction, a town in eastern Ohio along the Ohio River. *Id.* at 16, 20. Gaston was initially employed as a conductor trainee and later became a conductor. *Id.* at 16.

1

As a conductor, he was in charge of the overall operation of the train to which he was assigned. Reilly Dep. at 37-38. By contrast, an engineer's job is to operate the locomotive or engine. *Id.*

The accident in question occurred on February 6, 2016 at 12:20 a.m. in Martins Ferry, Ohio. Gaston began his shift at about 5:00 p.m. on February 5. Gaston Dep. at 34. He was assigned to Train C19C505, with engineer Mark Czup as the only other crew member. *Id.* at 33-34. Gaston and Czup departed Mingo Junction on locomotive NS 3313 to deliver rail cars to businesses along a railroad line heading south along the Ohio River. *Id.* at 35-36.

They reached the area of a Nickles Bakery facility in Martins Ferry with one or two rail cars attached to the train. *Id.* at 44. The main railroad line runs along the east side of State Route 7. West Dep. at 29. A spur track crosses Route 7 to the Nickles plant. Gaston Dep. at 46.

State Route 7 is a four-lane divided highway, with two lanes running in each direction. *Id.*; Doc. 98 at PAGEID 1252  A concrete median barrier divides the highway, with a gap in the barrier where the railroad track crosses Route 7.[1] Doc. 86 at PAGEID 766; Doc. 90 at PAGEID 938. The crossing where the spur line to the Nickles Bakery intersects with Route 7 is not perpendicular. Rather, if one pictures Route 7 as running north/south, the spur line crosses at about a 45º angle, running northwest/southeast. Doc. 86 at PAGEID 766; Doc. 98 at PAGEID 1252, 1264.

The crossing did not have gates. It did have other traditional warning devices. Doc. 90 at PAGEID 938-39. In each direction of traffic, round yellow railroad crossing signs are posted in advance of the crossing to the right side of the road. *Id.* at PAGEID 939. There are also pavement markings in the lanes, including solid white lines across the lanes and "RR" and "X" markings. *Id.* at PAGEID 938-39. Several sets of flashing red lights are placed at the crossing as well. Each direction of traffic has a pair of lights to the right side of the road on a vertical metal pole, to which is also attached a white X-shaped sign with the words "RAILROAD CROSSING." *Id.* at PAGEID 938. Extending horizontally from the pole, well above the roadway, is a cantilever with two more pairs of lights, one for each lane of traffic. *Id.*

Gaston and Czup crossed Route 7 from the main line to the Nickles plant without incident. Both men had worked with each other before at the crossing. Gaston Dep. at 20-21; Czup Dep. at 8-10; *see also* Gaston Dep. at 107 (testifying that Norfolk Southern ran a train to the Nickles plant three or four times a week). Czup stopped the train on the main line, and Gaston dismounted and

---

[1] The height of the median barrier is not described in the deposition testimony, but the court notes that based on photographs in the record, the barrier appears to be somewhat shorter than the roof line of a standard passenger car. *See*, Doc. 90 at PAGEID 938-39; Doc. 98 at PAGEID 1274.

threw a switch on the track so they could access the spur. Gaston Dep. at 41, 45. Gaston placed flare lights on the leading end and sides of the rail cars because the cars lacked their own lights and because the locomotive was last in line and was "shoving" (as opposed to pulling) the cars across the road to the Nickles plant. *Id.* at 50-51. Gaston then checked for vehicular traffic and walked across Route 7. *Id.* at 54-55. It was typical for Gaston to walk across Route 7 when they were crossing from the main line over to the Nickles plant. *Id.* at 54-55, 191.

After he crossed Route 7, Gaston removed a derail, which was a device on the track that prevented rail cars on the Nickles side from rolling down the track into the roadway. *Id.* at 56-57; Reilly Dep. at 46-47. Next he unlocked a control box containing two buttons which operated the flashing red crossing lights.[2] Gaston Dep. at 53-54, 57. Gaston could not see the lanes of traffic on Route 7 from the box because it was located a little bit off the road and amidst some "old weeds." *Id.* at 57; Doc. 86 at PAGEID 782, 784. So Gaston made it a practice to "stick [his] head out to make sure nothing was coming" in terms of traffic on Route 7. Gaston Dep. at 57-58. He returned to the box, turned on the crossing lights and radioed to Czup, "Okay back." *Id.* Czup proceeded to operate the train in a northwesterly direction across Route 7 towards the Nickles plant. *Id.* at 58. This process which Gaston and Czup performed that night was typical for how Gaston conducted a "shove move" at the Nickles crossing. *Id.* at 51, 55.

Once the train was on Nickles side, Gaston turned the crossing lights off. *Id.* at 63. They dropped the rail cars off at the Nickles plant, which took about ten minutes. *Id.* at 63-64. They left with no rail cars, so it was only the locomotive leaving the Nickles plant. *Id.* at 63-65, 84.

The locomotive was positioned such that the "short hood" or nose would be leading across Route 7. *Id.* at 64. Doc. 90 at PAGEID 937. The locomotive, marked as engine NS 3313, was about 71 feet long, 11 feet wide and 17 feet high. Byrnes Dep. at 40. With the short hood facing forward, there was a relatively small, exterior metal platform at the front of the locomotive. Doc. 86 at PAGEID 727-29; Doc. 90 at PAGEID 937. The platform had handrails in the front and a short series of built-in metal steps with handrails leading down from the platform to the ground on each side of the locomotive. Doc. 86 at PAGEID 727-29; Doc. 90 at PAGEID 937. The platform was at about the height or a little higher than the roof of a standard passenger car. Doc. 90 at PAGEID 937. The exterior side steps dropped down to just above ground level. Doc. 86 at PAGEID 727-

---

[2] A second control box was located on the east side of the crossing, but it was Gaston's practice not to activate the crossing lights until after he walked across to the west side of Route 7. Gaston Dep. at 53-55. He customarily used the second control box to deactivate the crossing lights after they were finished at the Nickles plant and had crossed back over to the main line. *Id.* at 187.

3

29; Doc. 98 at PAGEID 1272. Directly behind the platform was the cab, inside of which the engineer operated the locomotive. *Id.*; Doc. 90 at PAGEID 937.

The responsibility fell on Czup to check that the locomotive's headlights, ditch lights and horn all worked properly. Gaston Dep. at 65-66. Even so, Gaston had independently observed during his shift that night that these safety devices were operating properly. *Id.* at 66-67. The headlights were on the top front of the cab, while the ditch lights were at the platform level. Doc. 86 at PAGEID 727-29; Doc. 90 at PAGEID 937; Gaston Dep. at 93. According to Czup, the locomotive also had a bell that was activated, although there is no further testimony or discussion in the parties' briefs about the bell. Czup Dep. at 26; Doc. 88 at PAGEID 866 (Czup's statement to the police that the "bell was being used" at the time of the accident).

As they left the Nickles plant, Gaston instructed Czup to pull the locomotive slightly past the spot on the track where the derail was to be placed. Gaston Dep. at 65. This put the front end of the locomotive very close to the western edge of Route 7. *Id.* (estimating the distance from the locomotive to Route 7 was "about a sidewalk length"). With the locomotive so positioned, the exterior steps on the south side of the locomotive were about 3 or 4 feet from the control box for the crossing lights. *Id.* at 67-68. Gaston reapplied the derail and walked to the front of the locomotive to look for traffic on Route 7. *Id.* at 67-68, 81. Gaston described it as follows:

> I walked down past the front of the locomotive, looked north, looked south, didn't see anything out of the ordinary. I'm not saying there wasn't maybe a car coming south or something like that, just maybe a straggler, but there was no fire trucks, ambulances. Those are the kind of things I look for mainly.

*Id.* at 81. Gaston then walked to the control panel and activated the crossing lights. *Id.* at 73.

According to Gaston, Norfolk Southern had instructed him in the past that he should be aboard the locomotive's exterior side steps while performing the northwest-to-southeast crossing move from the Nickles plant back to the main line. The instruction came "about a year or so" before the February 6, 2016 accident, on a night where Gaston was at the Nickles/Route 7 crossing and decided to ride in the cab because it was cold outside. Gaston Dep. at 76-78. Unbeknownst to Gaston, a "saturation" or "SAT" team of Norfolk Southern trainmasters was stationed nearby to observe the crossing move and evaluate it for rules violations. *Id.* at 73-78, 186-191; *see also* Sargent Dep. at 16. The SAT team stopped the train once it had crossed and told Gaston that he was to not ride in the cab because it delayed the move. Gaston Dep. at 73, 75-76, 186-87. They instructed him to ride on the steps in order to expedite the move. *Id.* at 73-74, 78, 187, 190-91.

4

On February 6, 2016, once Gaston activated the crossing lights, he boarded the locomotive by stepping on the bottom step, or "sill step," on the south side of the locomotive. *Id.* at 73, 89 (testifying that he may have ended up one step above the bottom step). Gaston then radioed Czup, "Okay ahead." *Id.* at 83; Czup Dep. at 25. The headlights and ditch lights were already turned on. Czup Dep. at 25. When Gaston gave Czup the go-ahead, Czup sounded the train horn. *Id.*

The data recorder from the locomotive shows that Czup had begun to release the independent brake at 12:20 a.m. and 30 seconds. Reilly Dep. at 62; Doc. 92 at PAGEID 1164. Czup started to come out of the throttle 4 seconds later,[3] at what the data recorder logs as 00:20:34. Doc. 92 at PAGEID 1164. At 00:20:37, Czup blew the horn for one second. Doc. 92 at PAGEID 1165. Gaston testified that because it takes a moment for the train to actually move, he heard the first horn blow just before the train started moving. Gaston Dep. at 83; *see also* Czup Dep. at 24-25; Byrnes Dep. at 83-84 (testifying that the locomotive would start moving shortly after the engine comes out of the throttle). According to Gaston, it took 5 or 6 seconds from the time he activated the crossing lights until the locomotive started moving into the crossing. Gaston Dep. at 191-92.

Five seconds after Czup started coming out of the throttle, at 00:20:39, the locomotive reached a speed of 1 mile per hour. Doc. 92 at PAGEID 1165. The locomotive first crossed the two southbound lanes of Route 7. Gaston stood on the bottom exterior steps and faced north, such that he could look across the platform at any southbound traffic. Gaston Dep. at 82-83. He did not see any southbound traffic in the immediate vicinity. *Id.* at 84. Czup blew the horn again at 00:20:40 for 1 second. Doc. 92 at PAGEID 1165; *see also* Gaston Dep. at 83-84; Czup Dep. at 24. Within 4 seconds, at 00:20:44, the locomotive reached 5 miles per hour. Doc. 92 at PAGEID 1165.

While the locomotive crossed the southbound lanes, Gaston glanced over in the direction that the locomotive was headed and noticed a pick-up truck stopped at the crossing in the right-hand lane of northbound traffic. Gaston Dep. at 87-88.

Czup's attention was on looking ahead down the track, but at some point he noticed a car coming "fast" toward the locomotive in the northbound lanes. Czup. Dep. at 38. Though the car seemed to be slowing down near the crossing lights, Czup thought the car was "almost aiming for us." *Id.* at 18, 39.

Gaston first sensed something might be wrong when he heard Czup "holding the horn." Gaston Dep. at 85. This occurred as the front of the locomotive was going across the median, and

---

[3] The phrase "come out of the throttle" is used to refer to advancing the throttle. *See* Byrnes Dep. at 83-84.

5

Gaston had his back turned to the northbound lanes of Route 7. *Id.* The data recorder shows two 2-second horn blows: at 00:20:47 and 00:20:51. Doc. 92 at PAGEID 1165. With the locomotive going 8 miles per hour, Czup put the throttle in idle at 00:20:52 and began applying the independent brake at 00:20:53. *Id.*

Gaston remembers hearing an impact. Gaston Dep. at 85. He looked over and saw a car "up underneath the front of the locomotive." *Id.* Czup applied the emergency brake just after impact, at 00:20:58. *Id.*; Czup Dep. at 29; Byrnes Dep. at 108-09; Doc. 92 at PAGEID 1165. The locomotive came to a complete stop at 00:21:00. Doc. 92 at PAGEID 1165.

According to Czup's statement to the Martins Ferry Police, a black-colored car heading northbound proceeded past the crossing lights and "crashed into the front of the locomotive," "almost striking the conductor on the ladder step sill." Doc. 98 at PAGEID 1257. Czup estimated that the car missed hitting Gaston by "maybe a foot." Czup testified in his deposition that he did not actually see how closely the car came to striking Gaston because he could not see Gaston from the cab. Czup Dep. at 16, 18. But based on where Czup knew Gaston to be (on the steps) and where Czup saw the car hit the locomotive, he knew it was "close." *Id.* at 32.

The vehicle which hit the locomotive was a 2013 Chevy Cruze, a compact car. Doc. 98 at PAGEID 1253; Wallman Dep. at 16. Alexandra Wallman, who was 20 years old at the time and living in Brilliant, Ohio, drove the car on her way home after working a shift as a server at a nearby restaurant. Wallman Dep. at 6-7, 12-17. Wallman had driven Route 7 many times and had never before encountered a train at the Nickles crossing. *Id.* at 14, 24-25.

Going northbound on Route 7, Wallman traveled at about the speed limit of 50 miles per hour. *Id.* at 35, 54, 59; Doc. 98 at PAGEID 1253. The weather was dry. Doc. 98 at PAGEID 1252. She saw that the crossing lights were flashing and slowed down to about 30 or 35 miles per hour. Wallman Dep. at 54. Wallman drove in the left lane because it was less bumpy across the tracks than in the right lane. *Id.* at 43. She saw no other cars in the northbound lanes. *Id.* at 50-51.

Wallman testified that she perceived the color of the crossing lights as orange[4] and "thought it meant caution." *Id.* at 35, 56. She said that absent any crossing gates coming down, she was not aware that the activated crossing lights meant that motorists had to stop. *Id.* at 36, 44; *see also* Doc. 98 at PAGEID 1259 (statement to police); Czup Dep. at 37 (testifying that Wallman said to him after the accident, "How was I supposed to know what they [the crossing lights] meant?").

---

[4] Gaston and the officer who was dispatched to the accident scene testified that the crossing lights were red. Gaston Dep. at 60; West Dep. at 22.

6

Wallman further testified that she had her driver's side window "rolled down a little bit" but did not hear a train horn. Wallman Dep. at 35, 38, 62, 66-67. She also did not see any lights from the locomotive – either the headlights or ditch lights – in advance of the crossing. *Id.* at 40, 62-63. Not believing that she had a duty to stop at the crossing, Wallman proceeded at about 30 miles per hour. Wallman admitted in her deposition that if she had known she was required to stop at the crossing, she "had time to stop, and there was time between when I saw the [crossing] light for me to stop." *Id.* at 59; *see also id.* at 57 ("[I]f I would have stopped when I saw the lights, there would have been no collision.").

The locomotive's front end was entering the median area between the two directions of traffic when Wallman first saw it. *Id.* at 40-41, 63, 65. According to Wallman, it was at that point when the locomotive's lights were turned on: "[T]hat's when I saw the lights turn on. . . . [I]t was pitch black, and then everything lit up out of nowhere, and that was when I knew [a train was on the track]." *Id.* at 65-66.

Wallman slammed her brakes and skidded into the locomotive. *Id.* at 40, 42, 57, 62, 65-68. The impact of the collision triggered the airbag in Wallman's car to deploy, which in turn gave her a bloody nose. *Id.* at 44. In the split seconds before impact, Wallman looked up at the train and saw two individuals inside the cab. *Id.* at 48. She saw no one riding on the exterior steps. *Id.*

Photos of the accident scene show that the front, driver's-side corner of Wallman's car hit the front, south-facing corner of the locomotive, right near the steps on which Gaston says he stood. Doc. 98 at PAGEID 1262-77. A report prepared by Norfolk Southern concerning the incident identified the impact point on the locomotive as being the "snow plow and knuckle" on the front of the locomotive. Doc. 90 at PAGEID 935; *see also* Gaston Dep. at 92 (describing the place of impact on the locomotive as being its front "corner").

At the moment of collision, Gaston had his hands on the handrailing for the steps. Gaston Dep. at 89. The car did not directly strike him, but it was close enough that he could have stretched his leg out and touched the car with his foot. *Id.* at 90, 92. The impact of the collision "jarred [him] loose" and caused him to fall into the locomotive. *Id.* at 89-90. Gaston's reaction was to try to climb up the steps to get away from the car. *Id.* at 89, 93. He had trouble getting his footing because the impact "threw [him] around," so he "pulled" or "dragged" himself onto the platform. *Id.* at 89, 93-94. He ended up on his side, lying on the platform. *Id.* at 93, 95. After a few seconds, Gaston pulled himself up using the handrail on the platform and went to the cab to report the accident to Czup. *Id.* at 95-96.

7

Gaston called a Norfolk Southern dispatcher to report an emergency. *Id.* at 96. He then went to the platform and asked Wallman, who was standing outside of her car, if she needed anything from the train's first aid kit for her bleeding nose. *Id.* at 97.

Martins Ferry police arrived on the scene within a few minutes. They cited Wallman for failure to stop at the activated crossing lights. West Dep. at 29-30; Doc. 98 at PAGEID 1255, 1260.

Several representatives from Norfolk Southern arrived and assisted in clearing the train from the crossing and returning it to the main track. Doc. 98 at PAGEID 1260-61.

Gaston declined to be taken by ambulance to a local hospital. Doc. 98 at PAGEID 1260. On a Norfolk Southern accident form that he completed at the scene, Gaston noted that he did not have any injuries "at this time." Doc. 90 at PAGEID 923; Gaston Dep. at 115-16.

Gaston testified in his deposition that his back hurt "a little bit" right after the accident. Gaston Dep. at 105. He said that he initially did not appreciate the effects of being "jolted" and "bounced" around by the collision, but he later began feeling pain in his back and left leg and went to a hospital at some point on February 6, 2016. *Id.* at 113-14, 121-22. Gaston testified that he presently suffers pain in his back and left leg as a result of the accident. *Id.* at 193-96; Doc. 101-11 at PAGEID 1876, 1878.

### B.      Procedural History

Gaston filed this suit against Norfolk Southern and Wallman. In his Second Amended Complaint filed on November 14, 2019, Gaston brings a claim against Norfolk Southern under the Federal Employers Liability Act (FELA), 45 U.S.C. § 51, *et seq.* He asserts three theories of negligence against Norfolk Southern under FELA.

First, plaintiff alleges that it was negligent of Norfolk Southern to require him to ride on the exterior steps of the locomotive as it crossed Route 7 (the Riding-the-Steps Claim).

Second, he alleges that the engineer should have sounded the horn for 15 seconds before the locomotive entered the crossing (the Horn Claim).

Third, he alleges that Norfolk Southern should have instructed him to activate the crossing lights for 20 seconds before the locomotive entered the crossing (the Crossing Lights Claim).[5]

The Second Amended Complaint also asserts a common law negligence claim against Wallman. Plaintiff alleges that she violated Ohio law by proceeding through the crossing while the crossing lights were activated.

---

[5] Plaintiff also asserted a negligent training claim against Norfolk Southern, which he has since abandoned. *See* Doc. 101 at PAGEID 1350 n. 1.

Norfolk Southern and Wallman have asserted cross-claims for indemnification and contribution against each other.

Norfolk Southern has moved for summary judgment against plaintiff's claims under FELA. It also has moved for summary judgment against Wallman's cross-claims.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

#### A. FELA Negligence Standard

"Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . ." 45 U.S.C. § 51. "Under FELA, a railroad has a duty to provide its employees with a reasonably safe workplace; this does not mean that a railroad has the duty to eliminate all workplace dangers, but only the 'duty of exercising reasonable care to that end.'" *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 269 (6th Cir. 2007) (quoting *Baltimore & Ohio S.W.R. Co. v. Carroll*, 280 U.S. 491, 496 (1930)).

To prevail on a FELA claim, a plaintiff must prove that: (1) he was injured within the scope of his employment; (2) his employment was in furtherance of the carrier's interstate transportation business; (3) the carrier was negligent; and (4) the carrier's negligence played some part in causing his injury. *Van Gorder*, 509 F.3d at 269. Here, Norfolk Southern does not dispute that the first two elements are satisfied.

With respect to the final two elements, a plaintiff may "demonstrate liability as a matter of law if he proves that a railroad company violated a safety statute that establishes an absolute duty on the railroad company" and that the violation contributed to his injury. *Borger v. CSX Transportation, Inc.*, 571 F.3d 559, 563 (6th Cir. 2009). If a plaintiff cannot prove a violation of a specific safety statute, "he can still prevail by proving the 'traditional common law elements of negligence: duty, breach, foreseeability, and causation.'" *Id.* (quoting *Adams v. CSX Transp., Inc.*, 899 F.2d 536, 539 (6th Cir. 1990)). However, "FELA relaxes a plaintiff's standard of proof regarding causation." *Van Gorder*, 509 F.3d at 269. The "test of a jury case is whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury." *Rogers v. Missouri Pacific RR. Co.*, 352 U.S. 500, 506 (1957).

#### B. The Riding-the-Steps Claim

Gaston alleges that Norfolk Southern breached its duty to provide a reasonably safe workplace by instructing him to ride on the exterior steps of the locomotive as it traversed the Route 7 crossing from the Nickles plant to the main railroad line. In support of this claim, he points to

10

evidence that the crossing was known to have had accidents and "close calls" between train and motor vehicle traffic. He also emphasizes that a conductor riding on the steps is located at or near the same level of height as where a motor vehicle's front end would be located, if it were to collide with a locomotive. *See* Doc. 98 at PAGEID 1272.

"A railroad breaches its duty to its employees when it fails to use ordinary care under the circumstances or fails to do what a reasonably prudent person would have done under the circumstances to make the working environment safe." *Van Gorder*, 509 F.3d at 269. With respect to instructions, a railroad "is negligent if it assigns an employee to duties it knows or should know expose the employee to an unreasonable risk of harm." *Empey v. Grand Trunk W. R.R. Co.*, 710 F. Supp. 653, 664 (E.D. Mich. 1987), *aff'd*, 869 F.2d 293 (6th Cir. 1989) (citing *Fletcher v. Union Pac. R.R. Co.*, 621 F.2d 902, 909 (8th Cir. 1980)); *see also Ybarra v. Burlington N., Inc.*, 689 F.2d 147, 152 (8th Cir. 1982). Accordingly, a railroad breaches its duty when it "knew, or by the exercise of due care should have known that prevalent standards of conduct were inadequate to protect the plaintiff and similarly situated employees." *Van Gorder*, 509 F.3d at 269-70 (internal alterations and quotation marks omitted).

The only aspect of plaintiff's claim which Norfolk Southern challenges at summary judgment is the existence of an instruction. Norfolk Southern denies that it instructed Gaston to ride the steps at the Nickles/Route 7 crossing. The parties agree that there was no written rule or policy dictating how Gaston should have made the crossing. *See* Sargent Dep. at 50, 54-55; Byrnes Dep. at 58; Reilly Dep. at 93-94.[6] Regarding Gaston's allegation that a SAT team instructed him to ride the steps, Norfolk Southern contends that Gaston's testimony is too vague and fails to identify a specific person who gave the instruction or a specific date on which it was given.

The court must reject Norfolk Southern's argument because it goes to credibility, a determination the court cannot make at this stage. *See CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). The alleged lack of detail in Gaston's testimony may influence a jury in deciding how much weight to give to his account, but it does not make his testimony insufficient to withstand the motion for summary judgment. Gaston affirmatively testified that Norfolk Southern officials with authority told him, well before the accident, to ride on the exterior steps of the locomotive when conducting the northwest-to-southeast crossing move at the Nickles plant and Route 7. Gaston Dep. at 73-79, 186-91. The instruction came from a SAT team, which included a trainmaster whose

---

[6] After the February 6, 2016 accident, a rule was implemented by Norfolk Southern for the Nickles/Route 7 crossing. Sargent Dep. at 50-51.

11

authority included "observing and enforcing rules and regulations of Norfolk Southern." Sargent Dep. at 12. The trainmaster could tell a crew member "what they were supposed to do." *Id.* at 16.

Gaston did not recall the trainmaster's name but remembered him being from Youngstown. Gaston Dep. at 76-77. Norfolk Southern contends that its records show only two times (January 9 and 10, 2015) in which a Youngstown trainmaster served with a SAT team in the Mingo Junction area between November 2014 and March 2015. Palmer Aff. at ¶¶ 4, 7-8. The records further show that Gaston was on leave those two days. *Id.* at ¶ 10. Norfolk Southern insists that the alleged encounter between the SAT team and Gaston never happened and Gaston was never instructed to ride the steps.

The court cannot weigh evidence but must view the evidence in favor of the nonmovant. *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Liberally construing Gaston's testimony that he received the instruction "probably a year or so before" the accident, Gaston Dep. at 77, the court finds that a jury could reasonably determine that the relevant time frame should be wider than the November 2014 to March 2015 window used by Norfolk Southern to examine its records. A jury could also choose to credit Gaston's testimony over Norfolk Southern's records. Though Gaston could not remember a date or the trainmaster's name, he had a detailed recollection of the context in which he was given the instruction and of the instruction itself. *Id.* at 73-78, 186-191.

Gaston testified that the SAT team said the reason for the instruction was to expedite the crossing move and not delay the train. *Id.* at 75-76, 186-87. He was told that if he delayed trains that he "would be handled" for being insubordinate. *Id.* at 76. Gaston testified that Norfolk Southern generally pressured him and other crew members to expedite crossing moves and to keep trains moving so that crew members would "stay out of overtime." *Id.* at 68-78, 186-87. Working past a 12-hour shift was called "outlawing" and, according to Gaston, crews were "constantly" told that they "better not outlaw" or else they would be considered as "insubordinate" and "would be handled if [they] went into overtime." *Id.* at 71. *See also* 49 U.S.C. § 21103(a)(2).

Plaintiff has therefore put forth evidence from which a jury could find that Norfolk Southern directed him to ride the exterior steps of the locomotive while crossing Route 7 from the Nickles plant back to the main line. A jury could further find that Norfolk Southern knew or should have known that its instruction would expose Gaston to an unreasonable risk of harm. Plaintiff has submitted evidence showing that Norfolk Southern had notice before the accident that crew members believed the Nickles/Route 7 crossing posed a danger to their safety. Gaston had complained to supervisors about crew members being "susceptible to getting hit" at the crossing,

12

especially on trains "running at night." Gaston Dep. at 187-88. He notified them of the need to make the crossing safer after several Norfolk Southern trains were hit there by motor vehicles, including an incident where a crew member was almost hit. *Id.* at 187-89. Czup too complained to a Norfolk Southern safety committee member about how he had personally experienced several "close calls" at the crossing. Czup Dep. at 21-22. Though Gaston complained "all the time" and specifically asked for extra crew members to monitor vehicular traffic at the crossing, he was told "to stop" complaining and "to knock it off." Gaston Dep. at 187-88.

A jury could further find in plaintiff's favor on the final two elements of the claim. A jury could conclude it was foreseeable that Norfolk Southern's ride-the-steps instruction would put Gaston at or near the height of a motor vehicle, in a crossing where accidents had occurred in recent years.[7] A jury could also determine that the proximity of Gaston's position on the steps to the place of impact – not more than a few feet by Gaston's and Czup's accounts – contributed to his injuries, which Gaston described as having been caused by being jarred and thrown around by the collision. Gaston Dep. at 89-90; *see also* Doc. 101-11 (report of plaintiff's medical expert).

The motion for summary judgment is thus denied as to plaintiff's riding-the-steps claim.

### C. The Horn Claim
#### 1. The Applicable Regulation

Plaintiff alleges that Norfolk Southern was negligent *per se* because it violated a federal safety regulation concerning the amount of time a train horn should be sounded before the locomotive enters a crossing. Under the regulation (entitled "When must a locomotive horn be used?") horns generally must be sounded "at least 15 seconds, but no more than 20 seconds, before the locomotive enters [a] crossing." 49 C.F.R. § 222.21(b)(2). There are exceptions to this rule, including the following for trains which have stopped close to a crossing:

> (d) Trains, locomotive consists and individual locomotives that have stopped in close proximity to a public highway-rail grade crossing may approach the crossing and sound the locomotive horn for less than 15 seconds before the locomotive enters the highway-rail grade crossing, if the locomotive engineer is able to determine that the public highway-rail grade crossing is not obstructed and either:
>
> > (1) The public highway-rail grade crossing is equipped with automatic flashing lights and gates and the gates are fully lowered; or

---

[7] At summary judgment, Norfolk Southern does not dispute that Gaston was riding the steps at the time of the accident. The court notes that Wallman testified to the contrary. Wallman Dep. at 48.

13

>   (2) There are no conflicting highway movements approaching the public highway-rail grade crossing.

*Id.* at § 222.21(d).

Both sides agree that locomotive NS 3313 was stopped in close proximity to the Route 7 crossing. *See* Gaston Dep. at 65 (describing the locomotive as being stopped "about a sidewalk length" from Route 7). And for purposes of summary judgment, Norfolk Southern does not dispute that Czup sounded the horn less than 15 seconds before the locomotive entered the crossing.[8] Czup first sounded the horn at 00:20:37, as marked on the data recorder. Doc. 92 at PAGEID 1165. Two seconds later, the locomotive reached a speed of 1 mile per hour. *Id.* Seven seconds after the first horn, the locomotive reached 5 miles per hour and by the time 15 seconds passed, at 00:20:52, Czup had already idled the throttle in anticipation of a possible collision. *Id.*

The parties disagree about whether Czup determined if there were "conflicting highway movements approaching" the crossing. The term "conflicting highway movements" is not defined in the regulations, but the parties appear to agree that it relates to the common-sense question: are any vehicles coming in either direction? This question should be considered with the understanding that, as Gaston explained, the crew would not be concerned with non-emergency vehicles "way off in the distance" that "weren't anywhere close." Gaston Dep. at 84. Distant traffic would not be "conflicting."

Norfolk Southern argues that it is entitled to summary judgment on this matter because Gaston himself testified to having looked for conflicting highway movement before he radioed to Czup, "Okay ahead." *Id.* at 83. Plaintiff counters that Gaston looked primarily for ambulances and fire trucks, and not for all conflicting traffic. *Id.* at 81.

The court finds that Norfolk Southern has not met its burden at summary judgment. Under the exception to the 15-second rule, the engineer, not the conductor, bears the responsibility to determine whether there are any conflicting highway movements. 49 C.F.R. § 222.21(d). Czup's deposition does not contain any testimony about what Czup did, if anything, to determine whether there was conflicting movement on Route 7 before he began to cross. Norfolk Southern may well be correct that an engineer can rely on the conductor in making the determination; however, the record does not establish whether Czup and Gaston had a common understanding about what it

---

[8] Wallman testified that she did not hear a horn. Wallman Dep. at 35, 38, 62, 66-67. Even so, plaintiff has adopted the position that Czup in fact sounded the horn, but not for a long enough period of time before entering the crossing.

14

meant when Gaston said, "Okay ahead." Neither man gave any testimony on this subject during their depositions, nor have the parties asserted that the "okay ahead" signal had an accepted meaning at Norfolk Southern or within the industry.

It could be that the "okay ahead" signal meant that there was no conflicting highway movement and that Czup should sound the horn and proceed immediately. But it is equally as plausible on the current record that the signal meant only that Gaston saw nothing from the ground and that Czup should proceed with conducting his own check of traffic before making the crossing move. In the cab, Czup had a higher vantage point of Route 7 than did Gaston, who testified that his ability to see traffic was limited and that he was primarily concerned with the presence of emergency vehicles. *See* Byrnes Report ¶¶ 78-79 at PAGEID 718 (Czup's vantage point was about 10 feet higher than Gaston's); Gaston Dep. at 57-58, 81 (testifying of vegetation near the roadside); Doc. 90 at PAGEID 938 (concrete barrier in the median of Route 7 which plausibly could have limited Gaston's line of sight looking south).

Supporting plaintiff's claim that Czup did not check for conflicting highway movements is the evidence of two cars traveling northbound when the locomotive began the crossing move. Not only was Wallman driving northbound toward the crossing, but Gaston testified that he saw a pick-up truck stopped at the crossing in the right-hand lane of northbound traffic as the locomotive crossed the southbound lanes. Gaston Dep. at 87-88. There is no evidence that Czup spotted either vehicle before the locomotive began to cross Route 7.

Because a jury could reasonably find that Czup did not determine whether there were conflicting highway movements, it could conclude that Czup had a duty, which he breached, to sound the horn for 15 seconds before the locomotive entered the crossing.

### 2. Foreseeability and Causation

Foreseeability of harm is "an essential ingredient of [FELA] negligence." *Gallick v. Baltimore & Ohio RR. Co.*, 372 U.S. 108, 117 (1963). The test is not whether the particular "manner in which [the injury] occurred" was foreseeable. *Id.* at 120 n.8. It is whether a railroad should anticipate that its allegedly negligent act – here, a failure to sound the horn for the required period of time – would create a risk of harm to crew members on the train. *Id.* at 120-21; *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703-04 (2011). This test is satisfied here, as the horn provides an alert to the train's presence and the failure to sound it creates a risk that operators of other forms of ground transportation, including motor vehicles, will not have sufficient notice of the train to avoid potential collisions.

15

Turning to causation, FELA imposes liability when an employee's "injury or death result[s] in whole or in part from the negligence" of the employer. 45 U.S.C. § 51. In *McBride*, a divided United States Supreme Court reaffirmed the relaxed standard for causation in FELA cases, where the test is whether the employer's negligence "played any part, even the slightest, in producing the injury." 564 U.S. at 699 (citing *Rogers*, 352 U.S. at 506). The dissent argued that relaxed the standard amounts to "but for" causation and allows for "boundless theor[ies] of liability." *Id.* at 706 (Roberts, C.J., dissenting). But the majority expressed its reassurance that under its holding, trial judges would have "no warrant" to submit cases with "far out 'but for' scenarios" to juries. *Id.* at 704.

Here, plaintiff's theory of causation is not what one might expect. He does not claim that the proper sounding of the horn would have changed the motorist's behavior – that, for instance, sounding the horn earlier would have alerted Wallman to the presence of the train and caused her to stop at the crossing. Wallman testified that she did not hear the horn, and there is no evidence, nor any assertion by plaintiff, that Wallman would have operated her car any differently had Czup sounded the horn for 15 seconds before moving the locomotive into the crossing. Nor does plaintiff claim that sounding the horn earlier would have put Czup in a better position to react to and avoid the collision.

Plaintiff's theory instead is this: had Czup sounded the horn for 15 seconds before entering the crossing, the locomotive would have been delayed by about 10 seconds and would not have reached the left-hand lane of northbound Route 7 when Wallman's car arrived at the track. Had more time been spent sounding the horn, Wallman's car would have cleared the track by the time the locomotive got there.

In negligence cases outside the FELA context – where the common law standard of proximate causation applies – courts have roundly held that "arrival at the crossing" theories like plaintiff's are insufficient as a matter of law. *See Petre v. Norfolk S. Ry. Co.*, 458 F.Supp.2d 518, 537 (N.D. Ohio 2006). For example, in *Hotchkiss v. National Railroad Passenger Corp.*, 904 F.2d 36, 1990 WL 70700, at *7 (6th Cir. May 29, 1990), the Sixth Circuit rejected a negligence claim based on excessive speed. Plaintiff argued that if the train had slowed down, the motor vehicle would have had an "extra second" to safely cross the tracks. Applying Michigan law, the court held that this was insufficient to establish causation: "Speed is not causal merely because the train arrived at the crossing the instant it did, while if it had been going slower the [vehicle] might have safely crossed in front of it." *Id.*, 1990 WL 70700, at **8–9 ("Excessive speed is causal, however, when it prevents or retards the operator, after seeing danger, from slowing down, stopping, or otherwise controlling the

16

vehicle so as to avoid a collision") (quoting *Dombeck v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 24 Wisc.2d 420, 129 N.W.2d 185, 192 (1964)). *See also Lopez v. CSX Transp., Inc.*, 269 F.Supp.3d 668, 679 (W.D. Pa. 2017) ("Courts have long rejected excessive speed claims whose theory of proximate causation is that if a train had been traveling slower, the accident would have been avoided because the train would have arrived at the place of the collision after the plaintiff had safely crossed the tracks.") (citing cases); *Petre*, 458 F.Supp.2d at 535 (holding "Here, the whistle began sounding approximately 12 seconds prior to the collision. It is illogical to conclude that the 3-second delay in sounding the whistle prejudiced Mrs. Petre's ability to hear the whistle (when it would have been much further from the crossing), since she did not appear to hear the whistle when the train was upon her.").

However, a relaxed standard of causation applies in this FELA action. Only when "common sense" dictates that a but-for scenario is too attenuated or "far out" should a district court not send a claim to the jury. *McBride*, 564 U.S. at 704; *see also Murphy v. CSX Transp., Inc.*, No. 1:10-CV-35, 2011 WL 3881021, at *4 (E.D. Tenn. Sept. 2, 2011). The Court in *McBride* cited *Nicholson v. Erie R.R. Co.*, 253 F.2d 939 (2d Cir. 1958), as an example of such a scenario. In *Nicholson*, an off-duty, female railroad employee was struck by a passenger's baggage while returning from the female passengers' lavatory on the train. *Id.* at 940. Plaintiff asserted that the railroad was negligent in failing to provide her with a female employees' lavatory at the train station (her place of work), and she argued that but for the railroad's negligence, she would have not needed to use the bathroom on the train. The Second Circuit rejected this argument, finding that while the railroad's alleged negligence was the "literal[ ]" cause of the plaintiff's injury, it was "too far removed . . . in space and time" to satisfy even the "modest" causation requirements of FELA. *Id.* at 940-41.

The Sixth Circuit, before and after *McBride*, has held that the causation standard is satisfied so long as the injury "was within the risk created by" the negligent act, condition or omission. *Richards v. Consol. Rail Corp.*, 330 F.3d 428, 437 (6th Cir. 2007); *Szekeres v. CSX Transp., Inc.*, 617 F.3d 424, 430 (6th Cir. 2010); *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 601-02 (6th Cir. 2013).

In *Richards* – a decision the Supreme Court cited with approval in *McBride*, 564 U.S. at 700 n.9 – the Sixth Circuit denied summary judgment to the railroad where plaintiff, a conductor, slipped and fell while walking alongside a train to inspect it for problems after it unexpectedly stopped when a brake control valve malfunctioned. 330 F.3d at 431. The court held that the slip and fall was "within the risk created by" the defective brake valve, in that the defect required plaintiff to walk the length of the train and determine the cause of the problem. *Id.* at 437. "[I]f as a result of a defective

17

appliance a plaintiff is required to take certain actions and he or she is injured while taking those actions, the issue of causation generally should be submitted to a jury." *Id.* (footnote omitted).

In *Szekeres*, the Sixth Circuit denied summary judgment to the railroad where plaintiff slipped while climbing a muddy hill in search of somewhere to urinate in private because the locomotive's toilet was unusable. 731 F.3d at 596. The railroad's failure to provide a sanitary toilet violated an applicable regulation. *Id.* at 599. The district court found the situation to be indistinguishable from *Nicholson*, but the Sixth Circuit held that it was critical that plaintiff was on-duty at the time of the injury, whereas the plaintiff in *Nicholson* was off-duty. "Plaintiff was an employee of Defendant who was engaged in the course of employment, at his workplace, when the injury at issue occurred. Accordingly, as recognized by the Supreme Court in *McBride*, Plaintiff was precisely the kind of foreseeable plaintiff contemplated by FELA." *Id.* at 601. Unlike in *Nicholson*, the injury was not remote in place or time, but it was "within the risk created by" the unusable toilet. *Id.*

The court finds here that Gaston's injury was within the risk created by Czup's alleged negligence. Czup's failure to sound the horn for 15 seconds meant in turn that Gaston would be on a locomotive crossing Route 7 at the same time Wallman's car approached the track. The injury was not remote in place or time from the negligence – both the negligence and the injury occurred in the course of the locomotive making the crossing move at Route 7 on February 6, 2016 at 12:20 a.m.

Though Norfolk Southern contends that Wallman was the one who really caused the accident, FELA does not limit causation to one factor. *See* 45 U.S.C. § 51 (imposing liability when an employee's injury results "in whole or in part from the [railroad's] negligence). Plaintiff must establish only that the railroad's negligence "caused or contributed to" his injury. *McBride*, 564 U.S. at 705. Plaintiff has satisfied the "test of a jury case" by submitting evidence showing that Czup's negligence played a part, "even the slightest," in producing his injury." *Rogers*, 352 at 506; *accord McBride*, 564 U.S. at 703-04.

Accordingly, the motion for summary judgment is denied as to plaintiff's horn claim.

### D. The Crossing Lights Claim

Finally, plaintiff alleges that Norfolk Southern was negligent because it did not instruct him to activate the crossing lights at least 20 seconds before the locomotive entered the crossing. Plaintiff acknowledges that 49 C.F.R. § 234.225, the federal regulation which establishes the 20-second rule for crossing lights, does not apply here because the lights were manually activated (not automatically triggered) and because the train was stopped in close proximity to the crossing (and was not a through train). *See* Doc. 101 at PAGEID 1368; Doc. 99 at PAGEID 1297. Even so,

plaintiff contends that the 20-second rule is an industry standard and that Norfolk Southern's failure to require Gaston to comply with it constitutes negligence.

Defendant does not dispute that locomotive NS 3313 entered the crossing less than 20 seconds after Gaston activated the crossing lights. Gaston believed that 5 or 6 seconds passed from the time he activated the lights until the locomotive started to move into the crossing. Gaston Dep. at 191-92.

However, as defendant argues, plaintiff has not established the existence of a standard of care where a train is stopped in close proximity to a crossing with manually-activated crossing lights. Plaintiff does not cite any authority or provide any support for his assertion that 20 seconds is an industry standard. Plaintiff purports to cite an internal Norfolk Southern operating rule, but the rule expressly applies to automatic, not manual, crossing lights. *See* Byrnes Report ¶¶ 9 at PAGEID 711.

But even if plaintiff could establish a standard, he has failed to offer evidence from which a jury could find that Norfolk Southern instructed him to breach the standard. Though Gaston testified that Norfolk Southern generally pressured its crew members to expedite crossing moves, he did not testify of any instruction he was given about activating the crossing lights. *See* Gaston Dep. at 68-78, 186-87. Unlike the specific instruction he received to ride the steps at the Nickles/Route 7 crossing, Gaston did not offer testimony that he was told to unreasonably shorten the activation period for the crossing lights.

Accordingly, the motion for summary judgment is granted as to the crossing lights claim.

### IV. Conclusion

For the reasons stated above, defendant's motion for summary judgment (doc. 99) is granted in part and denied in part. The motion is granted as to plaintiff's crossing lights claim but denied as to his riding-the-steps claim and horn claim.

Defendant's unopposed motion for summary judgment as to Wallman's cross-claims for indemnification and contribution (doc. 100) is granted in part and denied in part. It is granted as to the cross-claim for indemnification because Wallman does not deny that she is not an innocent actor, and "indemnification under federal and state law . . . is available only when the party seeking indemnification is an innocent actor whose liability stems from some legal relationship with the truly culpable party." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 196 F.3d 617, 620 (6th Cir. 1999) (internal quotation marks omitted). The motion is denied as to the contribution cross-claim insofar as Wallman seeks contribution on the theory Norfolk Southern was negligent in instructing Gaston

to ride the steps of the locomotive or negligent in failing to sound the horn 15 seconds before the locomotive entered the crossing.

                                                                                                 s/ James L. Graham
                                                                                                 JAMES L. GRAHAM
                                                                                                 United States District Judge

DATE: September 18, 2020